IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JESSE BLOUNT III,<br><br>    Plaintiff,<br><br>v.<br><br>MORGAN STANLEY SMITH BARNEY LLC, and JIM NIELSEN, as an individual,<br><br>    Defendants.<br>_____ / | No. CV 11-02227 CRB<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Plaintiff Jesse Blount III, an African-American man, brings this employment discrimination suit against his employer, Morgan Stanley Smith Barney ("MSSB") and his supervisor at MSSB Jim Nielsen ("Nielsen"), alleging race discrimination and retaliation for prior claims against MSSB and Nielsen. Plaintiff also claims that Defendants failed to prevent discrimination and retaliation against him. Defendants move for summary judgment, arguing that Plaintiff was not subject to any adverse employment action, and even if he was, it was not the result of discrimination or retaliation. Upon consideration of the motion and the opposition thereto, the Court finds that Defendants are entitled to summary judgment.

**I. BACKGROUND**

Plaintiff, the only African-American Financial Advisor ("FA") in MSSB's San Jose office, has been employed as an FA for more than twenty-five years. In 2006, Plaintiff began to file complaints against his supervisors about treatment that he believed was

discriminatory. Plaintiff brought suit in 2007, but later released Defendants of all liability for actions that occurred before March 9, 2009 in connection with the Jaffe v. Morgan Stanley class action.[1]

In support of his claims of discrimination and retaliation, Plaintiff alleges that (1) MSSB's compensation structure favored white FAs; (2) MSSB managers refused to support Plaintiff's development of a business plan; (3) MSSB refused to hire Plaintiff's acquaintances, which interfered with his desired partnership structure; (4) MSSB fired Plaintiff's intern, which reduced the extent of his support services and negatively impacted his compensation; (5) MSSB replaced his Client Services Assistant ("CSA") with a less effective CSA; and (6) MSSB conducted a biased and ineffective investigation of his discrimination claims.

Plaintiff, along with Steve Parker and Tiffany Perez, initially filed suit on May 6, 2011. See generally Compl. (dkt. 1). Subsequently, Parker and Perez were removed as plaintiffs because they settled with Defendants. See Order and Stipulation of Dismissal With Prejudice (dkt. 98) at 1; Second Am. Compl. (dkt. 99).

## II. LEGAL STANDARD

### A. Summary Judgment

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict" for either party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome of the suit under the governing law. Id. at 248-49. To determine whether a genuine dispute as to any material fact exists, a court must view the evidence in the light most favorable to the non-moving party. Id. at 255. A

---

[1] This suit involved a nation-wide class of African-American and Latino FAs who presented statistical evidence that MSSB discriminated against FAs of color.

principal purpose of summary judgment "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

In determining whether to grant or deny summary judgment, it is not a court's task "to scour the record in search of a genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996) (internal quotation marks omitted). Rather, a court is entitled to rely on the nonmoving party to "identify with reasonable particularity the evidence that precludes summary judgment." Id.

### B. Employment Discrimination

A plaintiff can defeat a motion for summary judgment on an employment discrimination claim by producing "direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not motivated the employer." Surrell v. Cal. Water Serv. Co., 518 F.3d 1097, 1105 (9th Cir. 2008) (quoting Metoyer v. Chassman, 504 F.3d 919, 931 (9th Cir. 2007)).

In order to prevail in a Title VII case, plaintiff must first establish a prima facie case of discrimination. In particular, plaintiff must show that he was (1) a member of a protected class, (2) qualified for the position, (3) subjected to an adverse employment action, and (4) similarly situated to individuals outside the protected class who were treated more favorably. Aragon v. Republic Silver State Disposal, Inc., 292 F.3d 654, 658 (9th Cir. 2002). For discrimination claims, an adverse employment action "is one that 'materially affect[s] the compensation, terms, conditions, or privileges" of employment. Davis v. Team Elec. Co., 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting Chuang v. Univ. of Cal. Davis, Bd. of Trs., 225 F.3d 1115, 1126 (9th Cir. 2000)). For claims of status-based discrimination (race, color, national origin, sex, religion), plaintiff needs to show that "the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2523 (2013).

Once plaintiff establishes a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory

3

1 conduct. Surrell, 518 F.3d at 1106. If defendant articulates such a nondiscriminatory reason,
2 the burden shifts back to plaintiff to show that "the employer's proffered nondiscriminatory
3 reason is merely a pretext for discrimination." Id. (quoting Dominguez-Curry v. Nevada
4 Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005)).

### C.  Retaliation

To state a prima facie case of retaliation, plaintiff must show that (1) he engaged in a protected activity, (2) he suffered an adverse employment action, and (3) there was a causal link between the protected activity and the adverse employment action. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002). To establish that he suffered an adverse employment action, plaintiff must show that a reasonable employee would have found that the employment action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington N. and Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal quotation omitted). To show causation, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Nassar, 133 S. Ct. at 2528. In other words, plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Id. at 2533.

Once plaintiff establishes a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate reason for the adverse employment action. Surrell, 518 F.3d at 1106. If the defendant articulates a valid motive, plaintiff must show that the stated reason is merely pretext for retaliation. Id. (citing Dominguez-Curry v. Nevada Transp. Dep't, 424 F.3d 1027, 1037 (9th Cir. 2005)).

### III.  DISCUSSION

Defendant argues that Plaintiff fails to establish a prima facie case of discrimination because he was not subjected to any adverse employment action and because similarly situated employees were not treated more favorably. See Aragon, 292 F.3d at 658. In addition, Defendants proffer a legitimate reason for each action alleged to be adverse. The

4

Court first addresses incidents that do not constitute adverse employment actions as a matter of law, and therefore cannot serve as the basis for Plaintiff's discrimination claim.[2] For acts that may constitute adverse employment actions, the Court considers whether similarly situated employees were treated differently than Plaintiff. Finally, as to claims for which Plaintiff states a prima facie case, the Court analyzes whether Defendant has proffered a legitimate reason for the adverse employment action, and whether Plaintiff has shown that proffered reason is pretextual.[3]

### A. Plaintiff Has Not Established A Genuine Dispute Of Material Facts On His Discrimination Claim

#### 1. Defendants' Failure To Support Plaintiff's Business Plan, Extend Lunch Invitations, and Hire Acquaintances Are Not Adverse Employment Actions

Defendants assert that Plaintiff fails to present a prima facie case because he has not suffered an adverse employment action. In the context of discrimination, an adverse employment action is one that "materially affect[s] the compensation, terms, conditions, or privileges of . . . employment." Chuang, 225 F.3d at 1126. The Ninth Circuit has held a variety of actions to be adverse. See, e.g., Davis, 520 F.3d at 1090 (holding that an employee's exclusion from an important area of the workplace, together with discriminatory allocation of hazardous work assignments, materially affected the terms and conditions of the plaintiff's employment); Kang v. U. Lim Am., Inc., 296 F.3d 810, 818-19 (9th Cir. 2002) (holding that assignment of more, or more burdensome, work responsibilities constitutes adverse employment action). The definition of adverse employment action does not extend, however, to rude or offensive comments or mere ostracism. See Kortan v. Cal. Youth Auth., 217 F.3d 1104, 1112-13 (9th Cir. 2000) (finding that the plaintiff did not suffer an adverse

---

[2] The parties do not dispute the facts underlying these incidents.

[3] In addition to the claims discussed, Defendants move for summary judgment on Plaintiff's claim that he was discriminated against for being required to seek approval before working from home and that Nielsen provided white FAs with more perks. Because Plaintiff did not respond to these arguments in his opposition, the Court deems his claims abandoned.

employment action when she was repeatedly mocked and treated with hostility). As explained below, Plaintiff has failed to establish that MSSB's failure to respond to Plaintiff's business plan, invite Plaintiff to lunch, or hire his acquaintances are adverse employment actions.

### a. Failure To Support Plaintiff's Business Plan

Plaintiff contends that MSSB branch managers routinely collaborate with FAs to help formulate annual goals and business plans. On December 23, 2009, Plaintiff sent an email to Nielsen and Complex Manager Patricia Benner requesting a meeting to help him establish a business plan for 2010. Id. at 4-5; Blount Decl. (Dkt. 120) at ¶ 44. Neither manager responded to Plaintiff's email. Id. at 5.

As a general matter, lack of contact with an employee or co-worker does not constitute adverse employment action. See Davis, 520 F.3d at 1090 (limited lack of communication is not adverse, in contrast to a policy of exclusion were an employee is routinely denied access to employer). In contrast, if Defendants repeatedly refused or ignored Plaintiff's requests for assistance with his business plan, such conduct might constitute an adverse employment action. But in light of Plaintiff's twenty-five years as an FA at MSSB and the fact that he cites no other attempts to meet with the supervisors about his business plan, their failure to respond to one email during requesting a meeting does not rise to the level an adverse employment action.

### b. Exclusion From Lunches

Despite inviting other FAs to meals, Nielsen rarely invited Plaintiff. Plaintiff alleges that Nielsen's lack of collegiality and refusal to refer clients to Plaintiff "hurt him financially." Opp'n at 13. Plaintiff does not establish, however, that Nielsen's failure to invite him to lunch materially affected Plaintiff's employment. Simple exclusion from lunch with a supervisor "is normally trivial, a nonactionable petty slight." Burlington, 548 U.S. at 69. Plaintiff has provided no evidence that his compensation or business acumen would have improved as a result of attending these lunches, or that the FAs Nielsen included enjoyed

6

greater success.[4] Nor can it be said that Plaintiff was actually "excluded," as he was able to join in a lunch by simply asking to attend. Accordingly, Plaintiff's exclusion from some social events does not constitute an adverse employment action.

### c. Defendants' Decision Not To Hire Plaintiff's Acquaintances

Plaintiff sought to improve his business portfolio by hiring a business partner, and suggested a number of candidates for MSSB to consider. MSSB considered at least five candidates that Plaintiff endorsed: Phil Benjamin, Amy McCarthy, Deming Du, Steve Parker, and Tiffany Perez. Opp'n at 7. Nielsen hired only one of these candidates, Amy McCarthy, who Plaintiff describes as "young, Caucasian, and attractive." Id. at 6. McCarthy quit after three weeks for health reasons. Id.

Nielsen also interviewed Plaintiff's former brother-in-law, Steve Parker. Parker had nearly eight years of prior experience in the financial industry (including employment with MSSB), and his online application was given a score of "A." Id. at 7. After his interview, Nielsen shook Parker's hand and said "I think you'll do fine." Id.; Parker Decl. ¶ 18. As he exited Nielsen's office, Parker mentioned that he had previously been married to Plaintiff's sister, who is also African-American. Id.; Parker Decl. ¶ 20. When Parker inquired about his start date on the phone after returning from a vacation, Nielsen responded that he had "changed his mind" about offering him a job, and stated that he preferred not to provide a reason. Id.; Parker Decl. ¶ 24. After declining to hire all other candidates suggested by Plaintiff, Nielsen hired Julie Barros, a woman that Plaintiff did not know. Id. at 8.

Plaintiff alleges that Nielsen's failure to hire some of the candidates that Plaintiff suggested was motivated by discrimination. While a decision not to hire Plaintiff's acquaintance might serve as adverse employment action as to the <u>acquaintance</u>, it does not

---

[4] Although exclusion from lunches generally does not amount to an adverse employment action, exclusion from an important work-related activities— such as a weekly training lunch that contributes to the employee's professional advancement— could constitute an adverse employment action. See Burlington, 548 U.S. at 68. Plaintiff does not offer evidence that the lunches to which he was not invited were sufficiently work-related to meet this standard, however. Nor does he dispute Defendants' representation that he was invited to all training lunches held in the office.

7

1 constitute an adverse employment action as to Plaintiff. Thompson v. N. Am. Stainless, LP,
2 131 S. Ct. 863, 868 (2011). Plaintiff has not shown that his inability to partner with these
3 individuals materially affected his compensation or employment, as it might have, for
4 example, if Defendants had fired Plaintiff's existing partner.

5 Even assuming Plaintiff establishes a prima facie case, Defendants identified a
6 nondiscriminatory reason not to hire each of the individuals that Plaintiff endorsed. Deming
7 Du held many jobs over a short period of time and lacked recent FA experience. Mot. at 4.
8 Defendants state that Steven Parker did not believe that he was hired at the end of his
9 interview, and that Nielsen would confer with Dave Gambelin, another FA, before making
10 his final decision. Id. at 4-6. They subsequently decided not to hire Parker due to
11 reservations about his attitude and work history after speaking with past employers. Id. at 5-
12 6. Tiffany Perez was not hired for the FA Trainee program because she was already fully
13 registered, and it was against MSSB's policy to hire fully-registered FAs for the training
14 program. Id. at 6. In opposition to Defendants' Motion, Plaintiff adds that his former partner
15 Phil Benjamin also applied for an open FA position but was not hired. Opp'n at 5-6.
16 However, Plaintiff did not know Benjamin applied for the position, nor encouraged Nielsen
17 to hire him. Id. at 5.

18 Because the failure to hire an acquaintance is not an adverse employment action to
19 Plaintiff, none of these hiring decisions can support his discrimination claim.[5]

### d. Plaintiff's Claims Do Not Cumulatively Establish Adverse Employment Action

Plaintiff argues that the Court should not view each of these events in isolation to determine whether Plaintiff suffered an adverse employment action, but instead view them cumulatively. Opp'n at 17 (citing Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1051 (2005)). Specifically, Plaintiff argues that "context matters," and that while the failure to

---

[5] Although there seems to be a genuine dispute as to the facts surrounding these interviews, this dispute is not material because, as a matter of law, these decisions are not adverse employment actions as to Plaintiff. See Anderson, 477 U.S. at 248-49 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

8

1 help with his business plan may seem like an isolated incident, it is indicative of more serious
2 discrimination when put in the context of Plaintiff's exclusion from other company events.
3 Opp'n at 10 (citing Burlington, 548 U.S. at 69).

Federal district courts have not used this collective approach when evaluating adverse employment actions in Title VII discrimination cases. See, e.g., Lelaind v. City and Cnty. of S.F., 576 F. Supp. 2d 1079, 1091 (N.D. Cal. 2008) (finding that a series of separate but related acts collectively established hostile work environment); Abboub v. Int'l Bus. Mach. Corp., No. 04-0017, 2006 WL 905319, at *6 (N.D. Cal. Apr. 7, 2006) (citing Yanowitz and applying the collective approach to discrimination claims based on the California Fair Housing and Employment Act). Even if the Court were to consider all of the acts cumulatively, they would not amount to an adverse employment action.[6]

### 2. Plaintiff's Co-Workers Were Not Treated More Favorably With Respect To Intern Support And Inherited Assets

#### a. Firing Of Interns

In January 2010, Nielsen told Plaintiff that MSSB would no longer provide salaries for the company's interns, pursuant to a policy stating that interns could work a maximum of ten months. This included Plaintiff's intern of ten years, Vickie McCall, who he contends worked several hours per week on marketing associated with trade shows. Opp'n at 9. Although Blount offered to pay her salary himself, MSSB stated that it would prefer for McCall to study to become a full-time CSA. Id.; Blount Decl. ¶¶ 49-48. After McCall was terminated, Plaintiff conducted fewer trade shows, which led to a decline in his total revenue. Id.; Blount Decl. ¶ 56. Plaintiff contends that he was unfairly and arbitrarily deprived of support staff when MSSB suddenly began to enforce this standing policy.

Even if McCall's firing can be considered an adverse employment action as to Plaintiff, he cannot establish the fourth element of a prima facie case: that similarly situated

---

[6] Nor do Title VII retaliation claims consider whether the alleged acts, taken together, constitute adverse employment actions.

9

1 individuals were treated more favorably—meaning here that their interns were not fired.
2 Aragon, 292 F.3d at 658. Defendants state that McCall's termination was part of a branch-
3 wide effort to enact MSSB's policy not to employ interns for more than ten months. Since
4 Plaintiff has not shown that he was more negatively affected by MSSB's intern policy than
5 other FAs, he does not establish a prima facie case of discrimination based on this action.

### b. Distribution of Inherited Accounts

When FAs leave MSSB, clients who do not leave with them are distributed among the remaining FAs. Plaintiff contends that his revenue from such inherited accounts between June 2009 and November 2012 was considerably lower than nine similarly situated FAs. See Opp'n at 4. Defendants respond that the branch manager distributes accounts to FAs according to their "Power Rankings," a monthly calculation based on five factors: standard cap and reserved accounts (25%), total revenue (20%), new net assets (20%), retention of inherited assets (20%), and percent of Tier 1 revenue (15%). Steenhoek Decl., Exh. A-14 (dkt. 90-3) at 5. Once an inherited account is reassigned, that client still has the option of whether to stay with the newly assigned FA or to leave MSSB. MSSB's policy regarding inherited accounts was developed during the settlement of a race discrimination class action, which the court approved.[7] See Curtis-Bauer v. Morgan Stanley & Co., No. 06-3903, 2008 WL 4667090, at *6 (N.D. Cal. Oct. 22, 2008) ("As a result of concerns raised by counsel for the Plaintiffs in this action, Morgan Stanley changed the Power Ranking formula to de-emphasize past performance, tested the revised Power Ranking formula to see if it would have an adverse impact on minorities, and found that it did not.").

According to Defendants, Plaintiff was assigned inherited accounts based on his performance within his peer group, strictly due to his Power Ranking as calculated per the court-approved method. Of the nine other FAs Plaintiff worked with, Plaintiff's Power

---

[7] Jaffe v. Morgan Stanley and related class option involved a nation-wide class of African American and Latino FAs who presented statistical evidence that MSSB discriminated against FAs of color. The modified settlement agreement for Jaffe states that the settlement should not be used "as evidence of discrimination, retaliation or racial harassment." Steenhoek Decl., Exh. A-12 at 16.

10

Ranking was in the middle of his peer group between 2009 and 2012. When two FAs, Rodley Fabie and Aron Shimada, left the company, Plaintiff's Power Ranking was not high enough for him to inherit their accounts.

Although Plaintiff alleges that he received less pay from inherited accounts than other FAs, all inherited accounts were distributed according to the same court-approved method and he does not demonstrate that his co-workers were treated more favorably. See Govan v. Sec. Nat. Fin. Corp., 502 Fed. Appx. 671, 673 (9th Cir. 2012) (no discrimination based on race and religion because plaintiff's pay cut was "part of a broad pay reduction program"); Lias v. Cnty. of Alameda, No. 05-0317, 2006 WL 13050, at *3-4 (N.D. Cal. Jan. 3, 2006) (denial of retroactive pay not discriminatory where plaintiff did not show that employees outside of the protected class received better treatment under the policy). Without such evidence, MSSB's policy for distributing inherited accounts does not support a prima facie case of discrimination.

### 3. Replacement Of Plaintiff's CSA Had A Nondiscriminatory Purpose And Was Not Pretextual

In October 2010, Nielsen informed Plaintiff that management had replaced his CSA, Nicole Koke, with Cathy Edens, who had been assigned to him in 2006 and 2007. Opp'n at 9-10. The management noted that they believed that Plaintiff would be content with Edens' assignment because Plaintiff had previously complained about Koke's performance but had never complained about Edens'. Id. at 10. Plaintiff contends that because Edens was a less effective CSA than Koke, she could not successfully support four FAs, and his client support and compensation suffered as a result. Id.

Even if Plaintiff could state a prima facie case based on his CSA reassignment, Defendants have established a legitimate nondiscriminatory reason for the reassignment: specifically, that they were making an effort to accommodate Plaintiff by replacing a CSA who caused him to complain repeatedly with a CSA who had not. Defendants refute Plaintiff's allegation that the change "negatively affected" him more than white FAs with the explanation that MSSB assigns support staff to FAs at a ratio of approximately $1.5 million

in annual revenue per CSA. When Edens began supporting Plaintiff, she supported a total of four FAs with a total annual revenue of approximately $1.7 million. Soon after her reassignment, however, two of these FAs left MSSB, at which point Edens supported FAs with an annual revenue of approximately $1 million. Defendants thereby demonstrate that Plaintiff "consistently has enjoyed among the lowest revenue level ratio per CSA in the branch." Mot. at 10. Plaintiff has not produced any evidence that the CSA reassignment was merely pretext for discrimination.

### B. Plaintiff Has Not Established A Genuine Dispute As To Material Facts On His Retaliation Claim

Plaintiff also alleges that his EEOC complaints of discrimination led Defendants to retaliate against him by (1) denying business support the other FAs received, (2) refusing to hire Plaintiff's acquaintances, (3) firing Plaintiff's intern and appointing of a less effective CSA to handle his accounts.

Plaintiff has a lower burden to establish an adverse employment action on a claim of retaliation compared to a discrimination claim: he must only show that the alleged retaliatory act "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington, 548 U.S. at 68. The adverse employment action need not be severe. McAlindin v. Cnty. of San Diego, 192 F.3d 1226, 1239 (9th Cir. 1999); see Bouman v. Block, 940 F.2d 1211, 1229 (9th Cir. 1991) (plaintiff "need not show that she was fired, demoted or suffered some financial loss as a result" of the employer's action to state a retaliation claim).

When considering whether an alleged retaliatory act is an adverse employment action, "[c]ontext matters." Burlington, 548 U.S. at 69. For example, a "schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Id. Although it may be easier to establish an adverse employment action for a retaliation claim, the causation standard is higher than that required for a discrimination claim. Satisfying the causation element requires "proof that the desire to retaliate was the but-for cause of the challenged employment action." Nassar, 133 S. Ct. at 2528.

12

### 1. Exclusion From Lunches And Decisions Not To Hire Plaintiff's Acquaintances Are Not Adverse Employment Actions

#### a. Exclusion From Lunches

Taking the position that lunches with Nielsen were not just social events, but also business functions, Plaintiff argues that Nielsen's failure to include him could dissuade an employee from him from making or supporting a claim of discrimination. Plaintiff does not demonstrate this conduct is an adverse employment action.

Retaliation "by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." Burlington, 548 U.S. at 68. On the other hand, a supervisor's "refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight." Id. Plaintiff has not established that the lunches involved training or otherwise contributed to the attendees' profits or advancement, nor that he was excluded from such training lunches. See also § III.A.1.b, supra. As a result, the conduct falls short of an adverse employment action.

#### b. Decision Not To Hire Plaintiff's Acquaintances

Plaintiff argues that Nielsen's decision not to hire his acquaintances constitutes an adverse employment action because knowing that one's associates "will be blacklisted well might dissuade a reasonable worker from making or supporting a discrimination charge." Opp'n at 19. Plaintiff cites Thompson, 131 S. Ct. at 868, for the proposition that an employer's retaliation can be directed at third parties. Because the facts of Thompson are distinguishable, however, Plaintiff's reliance on the case is misplaced.

In Thompson, plaintiff was fired three weeks after his fiancé took protected actions against their mutual employer. Id. at 867. The Supreme Court held that a third-party who filed complaints against the employer could support the retaliation claim of an individual who did not engage in the protected activity. Id. Here, unlike the plaintiff's fiancé in Thompson, Plaintiff's acquaintances did not engage in any protected activity. Instead, it was Plaintiff who both engaged in protected activity and filed the retaliation claim. Even if the Court were to apply this analysis, Defendants' refusal to hire Plaintiff's acquaintances does

13

1 not rise to level of defendant's firing of plaintiff's fiancé in Thompson. See id. at 868
2 (declining to define a fixed class of relationships for third-party retaliation but stating that
3 "firing a close family member will almost always meet the Burlington standard, and
4 inflicting a milder reprisal on a mere acquaintance will almost never do so"). Accordingly,
5 Plaintiff has not established that Defendants' decision not to hire his business associates was
6 an adverse employment action.

### 2. Plaintiff Has Not Established That Reassignment Of His Support Staff Was Pretext For Discrimination

Plaintiff also contends that Defendants retaliated against him by firing his intern and reassigning a less effective CSA, but does not rebut the legitimate reasons Defendants proffer for these acts. First, MSSB represents that its decision to fire Plaintiff's intern was part of a branch-wide effort to enforce a policy to limit interns' employment to ten months, and Plaintiff does not show this explanation was pretextual. MSSB also offered a legitimate reason for his CSA's reassignment: Koke, a CSA who caused him to complain repeatedly, was replaced by Edens, a CSA who had previously worked with Plaintiff and never caused him to raise such complaints. MSSB's policy of matching one CSA with $1.5 million in annual revenue also undermines Plaintiff's allegation that MSSB intentionally assigned Edens to Plaintiff even though she would not be able effectively support four FAs. See also § III.A.3, supra. Plaintiff has not produced evidence that the stated reason for Edens' reassignment was merely pretext for retaliation.[8]

### C. Plaintiff's Claim That MSSB Failed To Prevent Discrimination and Retaliation Against Him Fails

Plaintiff claims that Defendants failed to prevent discrimination and retaliation against him in violation of California Government Code § 12940(k), which makes it unlawful for an

---

[8] Plaintiff states that Edens was "foisted" upon him "under a pastiche of pretexts," Opp'n at 17, but does not provide any evidence besides his own testimony that he opposed the reassignment or that it was pretext for discrimination. Plaintiff's uncorroborated statements on this point carry little weight because the Ninth Circuit "has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." Villiarimo, 281 F.3d at 1061 (quoting Kennedy v. Applause, Inc., 90 F.3d 1477, 1481 (9th Cir. 1996)).

employer "to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Solis v. Walgreen Co., No. 11-0605, 2013 WL 1942159, at *7 (N.D. Cal. May 9, 2013) (quoting Cal. Gov't Code § 12940(k)). "A cause of action under [§ 12940(k)] is viable only if the defendant engaged in actionable discrimination." Id. (citing Trujillo v. N. County Transit Dist., 63 Cal. App. 4th 280, 288-89 (1998) (finding that § 12940(k) does not support recovery "where there has been a specific factual finding that no such discrimination or harassment actually occurred at the plaintiffs' workplace.")). Accordingly, because Defendants are entitled to summary judgment on Plaintiff's claims for discrimination and retaliation, they are also entitled to summary judgment on his claim for failure to prevent discrimination and retaliation. See Knighten v. Omni Hotel, No. 12-2296, 2013 WL 4608192, at *6 (N.D. Cal. Aug. 28, 2013).

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' motion for summary judgment.

**IT IS SO ORDERED.**

Dated: October 17, 2013

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE